2015 IL App (1st) 141520

SECOND DIVISION
June 30, 2015

No. 1-14-1520

| | | |
|---|---|---|
| MARYLAND CASUALTY COMPANY, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | |
| DOUGH MANAGEMENT COMPANY, | ) | No. 11 CH 40014 |
| MICHAEL ROSE, ALAN ROSE, | ) | |
| SCOT VANDENBERG, and | ) | |
| PATRICIA VANDENBERG, | ) | Honorable |
| | ) | Kathleen Pantle, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE LIU delivered the judgment of the court, with opinion.
Justices Neville and Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1     This action arises out of a complaint for declaratory judgment filed by Maryland

Casualty Company (Maryland). Maryland seeks a declaration that it had no duty to indemnify its

insureds, Dough Management Company (Dough) and Michael Rose (collectively, the insureds),

in a personal injury lawsuit filed by Scot and Patricia Vandenberg, which arose from an accident

that occurred on a yacht that the insureds maintained and used. Following a hearing on the

parties' cross-motions for summary judgment, the circuit court granted Maryland's motion and

denied the motion filed collectively by Dough, Michael Rose, Alan Rose,[1] Scot Vandenberg and

Patricia Vandenberg (collectively defendants). On appeal, defendants assert that the circuit court

---

[1]     The notice of appeal includes Alan Rose as one of the appellants; however, the record shows that Alan
Rose was dismissed pursuant to a stipulation in which he asserted that he did not have any rights as an
insured under the subject insurance policy.

erred in granting summary judgment in favor of Maryland because: (1) the claims asserted by the Vandenbergs in the underlying action are covered by the insurance policy; and (2) the settlement ultimately reached by the parties in the underlying action was reasonable. We affirm.

¶ 2                                        BACKGROUND

¶ 3                                        A. The Parties

¶ 4     In September 2009, Scot Vandenberg was severely injured when he fell from the top deck to the bottom deck of a 75-foot yacht, the Bad Influence II.  Subsequently, in 2011, Scot and his wife Patricia brought a personal injury action for the catastrophic injuries that Scot sustained from the accident.  In the personal injury lawsuit, the following were named as defendants: (i) Dough, RQM, Inc. (RQMI), Location Finders International, Inc. (LFI), and Rose Paving Company (Rose Paving), the entities that allegedly owned, maintained, and chartered the yacht; (ii) Michael Rose, Alan Rose, and Carl Quanstrom, the alleged executive officers and directors of the foregoing named businesses; and (iii) Juan Castro, the captain of the yacht on the day of the accident.

¶ 5     Maryland is an insurer that provided coverage to Dough, as the named insured, under a commercial general liability policy (the CGL policy). Michael Rose is covered under the CGL policy as an executive officer or director of Dough.

¶ 6                                        B. The Policy

¶ 7     Maryland issued the CGL policy to Dough for the period effective November 4, 2008, through November 4, 2009. The policy states, in pertinent part, that Maryland will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' *** to which this insurance applies. *** However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' *** to which this insurance does not apply." The

Policy also contains an "Aircraft, Auto Or Watercraft" exclusion (watercraft exclusion), which applies to the following:

> " 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and 'loading or unloading.' "

¶ 8                                  C. Procedural History

¶ 9                          1.  Underlying personal injury action

¶ 10    In August 2011, the Vandenbergs filed their complaint in the underlying personal injury lawsuit against Dough, RQMI, LFI, Rose Paving, Michael Rose, Alan Rose, Quanstrom, and Castro in the circuit court of Cook County. The Vandenbergs alleged that on September 1, 2009, Scot was aboard the yacht for a charter cruise on Lake Michigan, during which he was "seated on a bench on the upper deck" of the Bad Influence II.  At one point, the bench "tipped backwards and he fell from the top of the yacht to the bottom deck."  As a result of the fall, Scot suffers from permanent paralysis.

¶ 11    The Vandenbergs asserted several claims in their complaint, including negligence against Castro and the "joint venture" of Dough, RQMI, LFI, and Rose Paving (collectively joint venturers). The Vandenbergs further alleged that Castro and the joint venturers were negligent because they engaged "in one or more" of the following acts or omissions:

> "a. Failed to provide railing or equivalent protection of the top deck peripheral areas which were accessible to passengers, including Plaintiff [Scot] ***;

b. Failed to prevent [Scot], other passengers and the band from accessing the rear of the top deck of the yacht *** which did not have railings or equivalent protection on the *** rear portion of the top deck;

c. Allowed passengers, including Plaintiff [Scot], to access areas of the top deck which did not have railings or equivalent protection;

d. Failed to warn passengers, including Plaintiff, [Scot], of the lack of railings or equivalent protection on the top peripheral areas of the top deck;

e. Allowed a bench to be placed inches from the rear of the unrailed top deck."

¶ 12    In their personal injury suit, the Vandenbergs also asserted a claim of alter ego liability, alleging that Michael Rose, Alan Rose, and Quanstrom "controlled and dominated" and "exercised such complete dominion and control" over the defendant businesses that they should be treated as alter egos of the companies.  Patricia also asserted claims for loss of consortium.

¶ 13                          2. Complaint for declaratory relief

¶ 14    In November 2011, Maryland filed its complaint for declaratory relief against the insureds and the Vandenbergs.[2]  As part of its allegations, Maryland denied that it had a duty to defend or indemnify based on the CGL policy's watercraft exclusion. Maryland asserted that the

---

[2]    Maryland also included LFI, Carl Quanstrom, and Alan Rose as defendants in its complaint, but all three parties ultimately stipulated to noncoverage and, as a result, the issues at the summary judgment stage were limited to whether the CGL policy covered the claims against Dough and Michael Rose.

watercraft exclusion precluded coverage because the underlying complaint alleged that the insureds "owned or operated the yacht" on which Scot was injured.

¶ 15    In March 2012, the Vandenbergs filed a motion for an extension of time to answer Maryland's complaint. They explained that they had requested leave to file an amended complaint in their personal injury action and wanted to obtain a ruling on this request before responding to Maryland's complaint.

¶ 16    In support of their motion, the Vandenbergs attached a copy of their proposed first amended complaint, in which they realleged their claim of negligent ownership, maintenance or use of a yacht based on the failure to provide a railing on the top deck. In addition, they added a new claim, "Negligent Ownership, Maintenance or Use of an Unstable Bench," specifically alleging that the insureds acted negligently by "provid[ing] a wobbly bench to be used by [Scot] from which he fell."

¶ 17    Although the court ultimately granted the Vandenbergs' motion for an extension of time, the Vandenbergs never filed their amended complaint in the underlying action. At the time the extension of time was granted, there was a January 2012 federal court order in a related admiralty action enjoining the Vandenbergs from prosecuting their personal injury lawsuit. (*In re RQM, LLC*, No. 10 C 55200 (N.D. Ill.)). According to defendants, this stay is the reason the Vandenbergs never amended their complaint.

¶ 18                                    3. The settlement

¶ 19    In August 2012, the parties in the personal injury action had a private mediation and entered into a settlement agreement, effective beginning August 9, 2012. According to the settlement, the Vandenbergs were to receive a sum of money through the insureds' assignment of

their right to indemnification from three insurance policies to the Vandenbergs, including Maryland's Policy.

¶ 20    Subsequently, Maryland moved for leave to file a supplemental declaratory complaint. According to the allegations in the supplemental complaint, Maryland asserted additional claims that the settlement was unreasonable and that Maryland had no duty to settle.

¶ 21                              4. Cross-motions for summary judgment

¶ 22    In November 2012, Maryland moved for partial summary judgment on its supplemental complaint, arguing that it had no duty to defend or indemnify the insureds in the underlying suit because the personal injury claims were excluded from coverage pursuant to the CGL policy's watercraft exclusion.

¶ 23    In their combined response and cross-motion for partial summary judgment, defendants contended that Maryland was required to indemnify the insureds for the settlement because the Vandenbergs had alleged a separate, independent cause of Scot's injuries to which the watercraft exclusion did not apply. Defendants maintained that according to the unfiled amended complaint, the Vandenbergs clearly alleged the insureds' negligent use of an "unstable bench" as a cause of Scot's injuries. In addition, defendants claimed that the insureds' use of the bench was completely independent from their maintenance or use of the yacht and therefore the CGL policy's watercraft exclusion did not preclude coverage of the Vandenbergs' claims.

¶ 24    Maryland filed its reply in support of its motion and response to defendants' cross-motion for summary judgment, maintaining that it had no duty to defend or indemnify the insureds for the settlement and that the settlement was unreasonable.

¶ 25    In their reply in support of their motion, defendants contended that Maryland was required to indemnify its insureds based on the "true, but unpleaded facts" in the allegations of

6

the Vandenbergs' unfiled amended complaint. Defendants argued that because these true, unpleaded facts presented a claim that the insureds negligently used an "unstable bench," a cause independent from the maintenance or use of the yacht, the watercraft exclusion did not apply to the Vandenbergs' personal injury claims.

¶ 26                                5. Extrinsic evidence

¶ 27    The parties included several depositions in briefing their motions for summary judgment. Defendants submitted the depositions of Scot Vandenberg, Juan Castro, and Michael DeLisa to show that the bench tipping over was not caused by the yacht. Maryland attached the deposition of John Daly to show that the bench was not "wobbly" or "shaky."

¶ 28    In addition, the parties each submitted a report from an expert who analyzed the way the bench moved in response to different actions taken by someone using it. Defendants presented the report of Robert K. Seyfried and Maryland submitted the report of Dr. Erick H. Knox.

¶ 29                                a. Scot Vandenberg's deposition

¶ 30    Scot Vandenberg testified that he recalled the lake being calm and the weather being clear and sunny immediately prior to his fall. He did not recall noticing whether the bench was sturdy when he sat down, but he also denied that he had any question about the bench being sturdy or not sturdy at the time. He explained that just before he fell, he was checking his phone when he heard someone yelling his name from "down below." He then testified that he "turned to [his] left, and [his] glasses were up on [his] forehead. [His] glasses started falling, and that's it." The last thing Scot recalled was reaching for his sunglasses; he did not remember the fall.

¶ 31                                b. Juan Castro's deposition

¶ 32    Juan Castro testified that he did not see Scot fall. At the time of the fall, the yacht was rafted to another 75-foot yacht and neither yacht had its engine running.

¶ 33                          c. Michael DeLisa's deposition

¶ 34    Michael DeLisa, another passenger on the yacht the day of the accident, testified that he was talking to Scot while Scot was sitting on the bench. DeLisa was standing next to Scot and the bench was "butted up to the lip of the boat." While they were talking, someone called Scot's name from below and DeLisa saw Scot lean back. DeLisa looked down to see who had called Scot's name and "then when [he] turned back around [Scot] was going over."

¶ 35                          d. John Daly's deposition

¶ 36    John Daly, a musician who played on the yacht the day of the accident, testified that he sat and played guitar on the same bench that Scot later fell from. Daly did not recall the bench wobbling, shaking, or moving at all while he used it. Daly did not see Scot fall.

¶ 37                          e. Robert K. Seyfried's expert report

¶ 38    According to his report, Seyfried tested the bench to determine under what circumstances it could be overturned to the rear in response to the actions of a seated person. He found that the bench overturned to the rear "if [he] was seated with [his] body in an upright position (not leaning against the back cushion), and [he] made a strenuous move to turn and reach toward the rear with [his] left hand while in a partial turn to [his] left." Seyfried found that that particular movement, which he tested "repeatedly," resulted in the bench overturning "multiple" times and that it was consistent with the actions Scot testified to taking prior to his fall. However, Seyfriend also stated that several witnesses had testified to the lack of a railing at the edge of the yacht's upper deck and noted:

> "If a normal ship's railing of 30 to 39 inches in height *** had been
>
> in place at the rear of the upper deck of the boat, it is certainly
>
> more probable than not that the railing would have prevented

[Scot's] fall to the lower deck of the boat. In the absence of such a railing, the prudent course of action would have been to effectively prohibit guests from occupying the area at the rear of the upper deck."

¶ 39                    f. Dr. Erick H. Knox's expert report

¶ 40    Dr. Erick H. Knox, a biomedical engineer who was hired "to perform an accident investigation and biomechanical/human factors analysis" of Scot's accident, analyzed the bench's performance "through several activities of both normal and aggressive nature." He had two "surrogates" perform several different activities, including sitting on the bench in different positions, moving and turning while sitting on the bench at different speeds, and sitting on the bench in an "aggressive manner." From his analysis, Knox determined:

"Mr. Vandenberg's account of his accident is not consistent with the laws of physics and therefore cannot be accurate. The force required to tip the bench over would be significantly more and of a different nature than the forces that result from his testified descriptions of his actions ***."

Knox also observed that, according to the report of a forensic toxicologist, Scot had an elevated blood-alcohol level at the time of the accident. He ultimately concluded that "the impairment on [Scot's] biomechanical capabilities to accurately sense, control, and maintain balance and posture as a result of alcohol ingestion was more likely than not the predominant factor in his fall."

¶ 41                    6.  Ruling on the motions

¶ 42    In May 2014, the circuit court granted Maryland's motion for summary judgment. The court found that the case was "not about 'true but unpleaded facts,' " that the allegations of

9

negligence in the underlying complaint were "inextricably bound to the use of the yacht," and that, therefore, the watercraft exclusion applied to the underlying claims.

¶ 43                                  ANALYSIS

¶ 44    On appeal, defendants contend that the circuit court erred in granting summary judgment in favor of Maryland because: (1) the personal injury claims are covered by the CGL policy; and (2) the settlement agreement was reasonable.

¶ 45    "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). Where, as here, the parties file cross-motions for summary judgment, they agree that no factual issues exist and that the disposition of the case only turns on the court's resolution of purely legal issues. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 432 (2010). We review a circuit court's ruling on a motion for summary judgment *de novo*. *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 213 Ill. 2d 58, 62 (2004).

¶ 46                               A. Policy Coverage

¶ 47    Defendants first contend that Maryland's duty to indemnify the insureds is supported by the allegations in the unfiled amended complaint and that the circuit court erred in not considering its allegations as true, unpleaded facts. In response, Maryland argues that it has no duty to indemnify because the CGL policy's watercraft exclusion applies to the underlying claims and that the allegations in the unfiled amended complaint do not constitute true, unpleaded facts. We first consider whether this watercraft exclusion applies to the underlying claims. For the following reasons, we find that it does.

¶ 48                    1. The watercraft exclusion

¶ 49    Generally, in order to determine whether an insurer has a duty to defend its insured, " 'a court must look to the allegations of the underlying complaints. If the underlying complaints allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent.' " *American Economy Insurance Co. v. DePaul University*, 383 Ill. App. 3d 172, 177 (2008) (quoting *Northbrook Property & Casualty Co. v. Transportation Joint Agreement*, 194 Ill. 2d 96, 98 (2000)). The duty to indemnify is far narrower than the duty to defend. *McDonald's Corp. v. American Motorists Insurance Co.*, 321 Ill. App. 3d 972, 979 (2001). First, the duty to indemnify arises only where the insured becomes legally obligated to pay damages in the underlying action that gave rise to the policy claims, such as when the underlying parties settle. *Universal Underwriters Insurance Co. v. LKQ Smart Parts, Inc.*, 2011 IL App (1st) 101723, ¶ 14. In addition, the insurer has a duty to indemnify "only if 'the insured's activity and the resulting loss *actually* fall within the *** policy's coverage.' " (Emphasis in original.) *Johnson v. State Farm Fire & Casualty Co.*, 346 Ill. App. 3d 790, 795 (2004) (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 128 (1992)).

¶ 50    Because the parties in the personal injury action settled, the question here is whether Maryland has a duty to indemnify its insureds and, accordingly, whether the underlying claims *actually* fall under the CGL policy's coverage. Therefore, we must look to the language of the CGL policy.

¶ 51    The construction of an insurance policy is a question of law, subject to *de novo* review. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292-93 (2001). According to our supreme court, the primary objective in construing an insurance policy's language is " 'to

ascertain and give effect to the intentions of the parties as expressed in their agreement.' " *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010) (quoting *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997)). In addition:

> " 'If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning. [Citation.] Conversely, if the terms of the policy are susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy. [Citation.] *** A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. [Citation.]' " *Wilson*, 237 Ill. 2d at 455-56 (quoting *Koloms*, 177 Ill. 2d at 479).

Furthermore, "where an exclusionary clause is relied upon to deny coverage, its applicability must be clear and free from doubt because any doubts as to coverage must be resolved in favor of the insured." *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 168 Ill. App. 3d 361, 367 (1988).

¶ 52    In the present case, the CGL policy specifically excludes coverage for any bodily injury "arising out of the ownership, maintenance, use, or entrustment to others of any *** watercraft owned or operated by or rented or loaned to any insured." Defendants do not dispute that the insureds "owned or operated" the yacht for purposes of the CGL policy. Instead, the parties disagree as to whether Scot's injuries arose out of the ownership, maintenance, or use of the yacht.

¶ 53   In the personal injury complaint, the only cause of Scot's injuries the Vandenbergs focus on is the lack of railing on the yacht's top deck. More specifically, the Vandenbergs alleged that the underlying defendants were negligent because they: (1) *failed to provide a railing* on the top deck; (2) failed to prevent passengers from accessing the area of the top deck that *lacked a railing*; (3) allowed passengers to access the area of the top deck that *lacked a railing*; (4) failed to warn passengers of the *lack of railing* on the top deck; and (5) "[a]llowed a bench *to be placed inches from *** the unrailed top deck*." (Emphasis added). In other words, the Vandenbergs only alleged that the insureds failed to properly maintain the yacht by failing to provide a railing on the top deck, allegations that fall squarely under the watercraft exclusion. Therefore, based on the personal injury complaint, the Vandenbergs' claims are excluded under the CGL policy.

¶ 54                               2. True but unpleaded facts

¶ 55   Defendants contend that Maryland's duty to indemnify arises from the "true, but unpleaded facts" contained in the allegations of the unfiled amended complaint. Specifically, defendants argue that their allegations that the insureds negligently used an "unstable bench" sufficiently stated a basis for liability that was independent from the ownership, maintenance, or use of the yacht. Defendants then propose that the bench was an independent proximate cause of Scot's injuries to which the watercraft exclusion did not apply and that, therefore, the CGL policy covers the personal injury claims. See *United States Fidelity & Guaranty Co. v. State Farm Mutual Automobile Insurance Co.*, 107 Ill. App. 3d 190 (1982) (where an underlying complaint alleges several causes of action or theories of recovery against an insured, the duty to defend arises even if only one or some of them are within the policy's coverage). In response, Maryland argues that the allegations in the unfiled amended complaint do not constitute true, unpleaded facts and the "unstable bench" may not be considered an independent basis of liability.

¶ 56 Under certain circumstances, in determining whether there is a duty to defend or indemnify, a court may look to "true but unpleaded facts," of which the insurer has knowledge, that potentially bring the underlying claims within policy coverage. *Farmers Automobile Insurance Ass'n v. Neumann*, 2015 IL App (3d) 140026, ¶ 14; *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301, 304-05 (1983). The Second District considered the true but unpleaded facts doctrine in *Shriver Insurance Agency v. Utica Mutual Insurance Co.*, 323 Ill. App. 3d 243, 247 (2001). In *Shriver*, Shriver Insurance Agency filed a complaint for declaratory judgment against its insurer, Utica Mutual Insurance Company, after Utica declined to defend Shriver in an underlying action. *Id*. at 246. Utica filed a motion to dismiss to which Shriver responded. *Id*. Shriver also filed a motion for summary judgment, arguing that Utica had a duty to defend because an insurer is required to defend its insured when it is aware of true but unpleaded facts that indicate a claim is potentially covered. *Id*. Shriver attached to its motion an affidavit from Shriver's president and a copy of a letter he sent to Utica informing Utica of the facts leading up to the underlying action against Shriver. *Id*. Specifically relying on the letter from Shriver's president, the circuit court granted Shriver's motion for summary judgment and found that Utica's duty to defend "had been invoked by true but unpleaded facts known to Utica." *Id*. at 246-47.

¶ 57 On appeal, the *Shriver* court first stated that the true but unpleaded facts doctrine does not apply in situations where the insurer possessed only extrinsic facts that were supplied by the insured because "[i]n such a situation the insurer has no way of knowing whether the facts are true unless it conducts an independent investigation." *Id*. at 251. The court further explained that, generally, in cases where a court has applied the true but unpleaded facts doctrine to show that an insurer has a duty to defend, "the extraneous facts possessed by the insurer and known to be true

14

were facts the insurer discovered during its own investigation of the underlying action." *Id*. The *Shriver* court then cited two First District cases that have applied the true but unpleaded facts doctrine: *La Rotunda v. Royal Globe Insurance Co.*, 87 Ill. App. 3d 446 (1980), and *Associated Indemnity Co. v. Insurance Co. of North America*, 68 Ill. App. 3d 807 (1979). The court observed:

"In [*La Rotunda*], the court determined that Royal Globe had a duty to defend where the results of its own investigation disclosed the true but unpleaded fact that all of the land in question was not used as a junkyard or refuse dump. Therefore, smoke from the land, which caused a driving accident on a neighboring road, might have come from the vacant part of the land and not the junkyard, making the business exclusion in Royal Globe' policy inapplicable.

In [*Associated*], the insurer, Insurance Company of North America (INA), knew that unpleaded facts related to it by Associated Indemnity were true. INA possessed a file containing documents produced in the underlying litigation that verified the truth of Associated Indemnity's facts. Also, INA knew the facts to be true because it was defending another party in the underlying action." *Shriver*, 323 Ill. App. 3d at 251-52.

In *Shriver*, however, the court ultimately found that, even if it were to accept the unpleaded facts in the letter from Shriver's president as true, the facts still did not raise the possibility that the underlying action was within coverage of Utica's policy. *Id*. at 252.

¶ 58    In the present case, defendants first argue that the Vandenbergs "expressly mention[ed] the unstable bench" in their filed personal injury complaint and that these references "can be read" to state a claim that Scot's injuries were caused by the bench. However, a review of the underlying complaint shows that the Vandenbergs only referred to the bench in two contexts: (1) when they alleged that "the bench tipped backwards and [Scot] fell from the top of the yacht to the bottom deck"; and (2) when they alleged that the insureds were negligent for allowing "a bench to be placed inches from the rear of the unrailed top deck." Moreover, the Vandenbergs never referred to the bench as "wobbly" or "unstable" in the underlying complaint. As we noted above, the allegations that refer to the bench focus on the bench being placed close to the edge of the unrailed top deck, an allegation specifically relating to maintenance of the yacht. The mere mention of the bench existing or even tipping is not enough to show that the Vandenbergs alleged that the bench was an independent cause of Scot's injuries.

¶ 59    Defendants further contend that their independent theory of liability is supported by the allegations in the unfiled amended complaint, in which the Vandenbergs asserted a new claim based on the insureds' negligent use of an "unstable bench." More specifically, the Vandenbergs alleged that the insureds were negligent in "provid[ing] a wobbly bench to be used by [Scot] from which he fell." However, the amended complaint was never filed. As the *Shriver* court noted, true but unpleaded facts typically do not include those facts where the insurer has no way of knowing whether the facts are true unless it conducts an independent investigation. *Id.* at 251. We conclude that the self-serving allegations in an unfiled amended complaint cannot be presumed true and are not the type of facts intended to be covered by the true but unpleaded facts doctrine. See 735 ILCS 5/2-605 (West 2010) (stating that verified allegations in a pleading "do not constitute evidence except by way of admission"). Defendants have not cited and our

16

research has not revealed an instance in any jurisdiction where a court considered the allegations in an unfiled complaint as true but unpleaded facts. Moreover, the truth of the Vandenbergs' allegations that the bench was "wobbly" and "unstable" cannot be verified without an independent investigation. Because the allegations in the unfiled amended complaint are not true but unpleaded facts, defendants cannot argue that the negligent use of the "unstable bench" was presented as an independent theory of liability. See *Perona v. Volkswagen of America, Inc.*, 2014 IL App (1st) 130748, ¶ 40 (finding that the plaintiffs were not entitled to summary judgment on a theory that they had never pled).

¶ 60    Defendants claim that *Shriver* and the cases that follow it are distinguishable because the unfiled amended complaint was not supplied by the insureds; rather, it was supplied by the plaintiffs in the underlying lawsuit and thus should not be viewed suspiciously. See *Pekin Insurance Co. v. Precision Dose, Inc.*, 2012 IL App (2d) 110195, ¶ 44 (noting that, "*Shriver* teaches that unpleaded facts that the insured gives the insurer should be viewed with suspicion when determining the duty to defend, because the insurer has no way of knowing whether the facts are true without [independent verification]"). However, in this instance, where the proposed true but unpleaded facts are the allegations in an unfiled amended complaint, this is a distinction without a difference. Pleadings are, in their very nature, self-serving documents that contain allegations, not proven or agreed-upon facts. See 735 ILCS 5/2-605 (West 2010). Accordingly, not only should the allegations in an unfiled amended complaint be viewed with suspicion, but also, they simply do not constitute true but unpleaded facts.

¶ 61    Defendants also argue that the extrinsic evidence in the record supports their theory that the unstable bench was an independent cause of Scot's injuries, but this is merely a repackaging of their previous claim that we should consider the allegations in the unfiled amended complaint.

17

Having found that the "unstable bench" theory was not properly asserted in the underlying action, we decline to consider the evidence presented in support of the theory.

¶ 62    We find it important to note that our analysis might be very different if the Vandenbergs had filed their amended complaint. We have read the cases cited by the parties discussing the applicability of insurance policy exclusions where the underlying plaintiff alleged multiple independent proximate causes of an injury.[3] Our reading of these cases convinces us that the question of whether the watercraft exclusion applies to the personal injury claims would be a much closer question if the Vandenbergs had properly alleged the negligent use of an unstable bench as a separate claim. However, the Vandenbergs did not file the amended complaint and that question is not properly before us.

¶ 63    Because the Vandenbergs' underlying complaint alleged only claims that were directly related to the maintenance of the yacht, the CGL policy's watercraft exclusion applies and Maryland has no duty to indemnify Dough or Michael Rose. Under these circumstances, we find that the circuit court properly granted summary judgment in favor of Maryland and denied summary judgment to defendants.

¶ 64                                    B. The Settlement

¶ 65    Based on our determination that the circuit court properly granted summary judgment in favor of Maryland based on the CGL policy's watercraft exclusion, we need not reach the question of whether the settlement was reasonable.

---

[3]    See, *e.g.*, *Northbrook Property & Casualty Co. v. Transportation Joint Agreement*, 194 Ill. 2d 96 (2000); *Allstate Property & Casualty Insurance Co. v. Mahoney*, 2011 IL App (2d) 101279; *Maxum Indemnity Co. v. Gillette*, 405 Ill. App. 3d 881 (2010); *State Farm Fire & Casualty Co. v. Perez*, 387 Ill. App. 3d 549 (2008); *Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care*, 343 Ill. App. 3d 309 (2003); *United States Fidelity & Guaranty Co. v. State Farm Mutual Automobile Insurance Co.*, 152 Ill. App. 3d 46 (1987); *Louis March, Inc. v. Pekin Insurance Co.*, 140 Ill. App. 3d 1079 (1985); *United States Fidelity & Guaranty Co. v. State Farm Mutual Automobile Insurance Co.*, 107 Ill. App. 3d 190 (1982).

¶ 66                                CONCLUSION

¶ 67    As a final matter, we acknowledge Maryland's additional assertion that the Vandenbergs' claims were not covered pursuant to the joint venture exclusion in the CGL policy. However, because the watercraft exclusion precludes defendants' recovery, we decline to consider whether the joint venture exclusion similarly precludes recovery.

¶ 68    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 69    Affirmed.